**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

MARQUEL ALI,

               Plaintiff,

v.                                  CIVIL ACTION NO.  5:17-cv-03386

RALEIGH COUNTY, et al.

               Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendants Gary Epling and Jason Redden's Motion for Summary Judgment* (Document 242), *Defendants Gary Epling and Jason Redden's Memorandum of Law in Support of their Motion for Summary Judgment* (Document 243), the *Plaintiff's Response to Defendant's Motion for Summary Judgment* (Document 271), *Defendants Gary Epling and Jason Redden's Reply to the Plaintiff's Response to Defendants Motion for Summary Judgment* (Document 291), *Defendants Raleigh County and Steven Tanner's Motion for Summary Judgment* (Document 244), *Defendants Raleigh County and Steven Tanner's Memorandum of Law in Support of Their Motion for Summary Judgment* (Document 245), the *Plaintiff's Response in Opposition to Defendants Raleigh County and Tanner's Motion for Summary Judgment* (Document 267), *Defendants Raleigh County and Steven Tanner's Reply to the Plaintiff's Response to Defendants Raleigh County and Steven Tanner's Motion for Summary Judgment* (Document 288), *Defendants City of Beckley and David Snuffer's Motion for Summary Judgment*

1

(Document 246), *Defendants City of Beckley and David Snuffer's Memorandum of Law in Support of their Motion for Summary Judgment* (Document 247), the *Plaintiff's Response to Defendants City of Beckley and David Snuffer's Memorandum and Motion for Summary Judgment* (Document 269), *Defendants City of Beckley and David Snuffer's Reply to Plaintiff's Response to their Motion for Summary Judgment* (Document 287), *Defendant Kenneth Pack's Motion for Summary Judgment* (Document 248), the *Memorandum in Support of Defendant Kenneth Pack's Motion for Summary Judgment* (Document 249), *Plaintiff Marquel Ali's Memorandum in Support of Response in Opposition to Defendant Pack's Motion for Summary Judgment* (Document 266), *Defendant Kenneth Pack's Reply to "Plaintiff Marquel Ali's Memorandum in Support to Response in Opposition to Defendant Pack's Motion for Summary Judgment"* (Document 292), all attached exhibits and the *Amended Complaint* (Document 23). For the reasons stated herein, the Court finds that the motions for summary judgment should be granted.

## PROCEDURAL HISTORY

On June 23, 2017, the Plaintiff, Marquel Ali, initiated this suit with a *Complaint* (Document 1). On August 23, 2017, Mr. Ali filed an *Amended Complaint* (Document 23) against the Beckley Police Department, the City of Beckley, Gary Epling, David Snuffer, Kenneth L. Pack, Raleigh County, the Raleigh County Sheriff's Department, Jason Redden, Steven Tanner, and the West Virginia State Police. Mr. Ali's amended complaint sets forth eleven counts: Count I - Race Discrimination, Count II - Color Discrimination,[1] Count III - Discrimination and Interference with Plaintiff's Right to Equal Benefit of the Law in Violation of 42 U.S.C. § 1981, Count IV -

---

[1] The Plaintiff asserts the first two causes of action only against the Raleigh County Sheriff's Department and Defendant Tanner.

Warrantless Arrest Pursuant to False Tip in Violation of 42 U.S.C. § 1983, Count V - Conspiracy to Interfere with Constitutional Rights in Violation of 42 U.S.C. § 1985(3), Count VI - Neglect to Prevent Conspiracy to Interfere with Plaintiff's Rights, Count VII - False/Wrongful Arrest and Improper Investigation and Prosecution in Violation of 42 U.S.C. § 1983, Count VIII - Abuse of Process, Count IX - Malicious Prosecution, Count X - Negligent Infliction of Emotional Distress, and Count XI - Outrage. After the Court's ruling on the motions to dismiss, the remaining Defendants are: Steven Tanner, former Sheriff of Raleigh County; Gary Epling, detective with the Raleigh County Sheriff's Department; Kenneth Pack, officer with the West Virginia State Police; David Snuffer, officer with the Beckley Police Department; and Jason Redden, parole officer with the West Virginia Division of Corrections. These remaining claims are against the Defendants in their individual capacities only.

## FACTS

The genesis of Mr. Ali's suit begins with his employment with the Raleigh County Sheriff's Department. On March 18, 2014, Raleigh County hired Mr. Ali as one of its deputies.[2] Mr. Ali is an African American male.[3] Before hiring Mr. Ali, then Sheriff Tanner interviewed him. The interview lasted only a few minutes, and during the interview Mr. Tanner asked Mr. Ali "do you

---

2 Pursuant to W. Va. Code § 7-14-7, new officers "shall be for a probationary period of twelve months." Additionally, "at any time during the probationary period the probationer may be discharged for just cause. . ." and "[i]f, at the close of this probationary period, the conduct or capacity of the probationer has not been satisfactory to the appointing sheriff, the probationer shall be notified, in writing, that he will not receive absolute appointment, whereupon his employment shall cease." *Id.*

3 Neither the briefs nor the exhibits provide information or statistics regarding the racial diversity of the Raleigh County Sheriff's Office. However, Tanner admits that another African American male was hired at the same time as Ali. Notably, the evidence before the Court does not specify the total number of people hired along with Ali. (Tanner's Response to Pl.'s First Set of Request for Admission, Interrogatories and Request for Production, Document 273-7).

think you'll fit in here[?]" (*Ali Dep.* 242:8-9, Document 273-1). In February 2015, Lt. Halstead evaluated Mr. Ali's performance as a deputy sheriff and concluded that it was "satisfactory."

On March 3, 2015, Jane Doe made a complaint against Mr. Ali.[4] After filling out a complaint form, Jane Doe made a statement to Captain Larry Lilly of the Raleigh County Sheriff's Office. Jane Doe alleged that on February 21, 2015, Mr. Ali and another officer responded to a call at Jane Doe's house for domestic violence. The officers arrested Jane Doe based on a bench warrant from Wyoming County. While in the back seat of the police car, Jane Doe alleged that Mr. Ali had "something hanging with his stuff in it which had two prescription pill bottles and his ticket book and reports." (Statement of Jane Doe, pg. 1, Document 273-2). She admitted "I went through it and I put the pills and stuff in my hoodie and I thought I was going to use like some leverage over him like so he wouldn't give me a bunch of charges." *Id.* Mr. Ali alleged that she attempted to escape and got the pills from the glove box of the car.[5] While Jane Doe was in custody, she alleged that Mr. Ali was on a video call talking about the domestic violence incident and the incident involving the pills. During the statement, Jane Doe also alleged that she knew of Ali selling marijuana in high school, although she never purchased marijuana from him. While Jane Doe was giving her statement, Captain Lilly began asking questions, which he stated were a part of an internal investigation. At that point, Jane Doe stated:

> It's just the fact that he's a cop that just irks me, like he's just a regular "Nigger" off the street. At the end of the day the "Nigger" went from selling weed to, just because he didn't get caught, just think about it if I never would have got caught selling dope I could be a cop right now, bottom line. Do you know what I'm saying he just didn't get caught that's the only difference, things should change for him.

---

4 Pursuant to a protective order (Document 282), this person will be referred to as Jane Doe.
5 During the interview, Jane Doe also stated, "I didn't escape in no kind of way, but I got the pills from his glove box." (Statement of Jane Doe, pg. 12, Document 273-2).

(Statement of Jane Doe, pg. 12, Document 273-2).   She also alleged that Mr. Ali associated with drug dealers in Beckley.   *Id*.

On March 11, 2015, then Sheriff Tanner requested that Captain Lilly conduct an internal investigation of Mr. Ali based on Jane Doe's statement.   That same day, Mr. Ali was suspended pending the investigation.   The internal investigation sought to address three allegations made by Jane Doe: "1. [i]mproper handling of evidence, 2. [l]eaving a prisoner unattended, [and] 3. [i]mproper use of handcuffs." (Raleigh County Sheriff's Office Report, Pg. 2, Document 273-4). After conducting the investigation, Captain Lilly concluded that the exact origin of the pills was unknown, although Mr. Ali claims that they were recovered at the scene of a crash a week earlier. Captain Lilly also concluded that there was no documentation to support this claim.   He did not make a conclusion with respect to the improper use of handcuffs.   Finally, he concluded that Jane Doe was not left unattended, because another Deputy Sheriff was a short distance away from the car. (*Id*. at 10-11).

On March 17, 2015, Mr. Ali was terminated and timely filed a grievance with the Raleigh County Civil Service Commission ("Civil Service Commission").   On June 2, 2015, the Civil Service Commission held a hearing on Mr. Ali's grievance regarding his termination by Mr. Tanner and Raleigh County.   During the hearing, Mr. Ali contended that Mr. Tanner and Raleigh County discriminated against him because of his race.   The parties were required to submit proposed findings of fact and conclusions of law to the Commission by June 22, 2015.

In November 2014, prior to his termination, Mr. Ali had arrested Thomas Short for shoplifting.   Mr. Short gave Mr. Ali his brother's identification.   Mr. Short, still posing as his brother, pled guilty and was convicted.   Mr. Short's brother did not know he was convicted of a

crime until he sought to renew his driver's license.   On June 16, 2015, Mr. Short's brother went to the Beckley office of the West Virginia State Police to file a report and spoke with troopers K.A. Filer and Wood.   On June 23, 2015, (the day after proposed findings of fact and conclusions of law were due to the Commission) Trooper Aaron Wood called Mr. Ali to inform him that a complaint was filed against him and asked Mr. Ali if he was able to meet in Beckley to discuss the matter.   Mr. Ali indicated that he was not able to meet that day.

On June 23, 2015, parole officer Jason Redden received a phone call from Ella Coppola, Jerell Johnson's mother.[6]   At the time, Mr. Johnson, who is Mr. Ali's cousin, was living with Ms. Coppola.   After calling Mr. Redden, Ms. Coppola met with him and reported that Mr. Johnson was dealing drugs and storing drugs in her home.   Mr. Redden contacted Detective David Snuffer, and asked the Beckley/Raleigh County Drug and Violent Crime Task Force Unit ("Task Force") to assist in apprehending Mr. Johnson.

As a condition of his parole, Mr. Johnson was on a GPS monitoring system.   Mr. Redden and the Task Force were going to Ms. Coppola's house, where Johnson was living, but when parole officer Redden attempted to confirm that Johnson was still there, the GPS indicated he was not home and on the move.   Initially, Redden and the Task Force went to a Family Dollar store to locate Johnson, but by the time they arrived, Mr. Redden realized that he was no longer at the store.[7]   Fletcher Johnson picked up Mr. Johnson at the Family Dollar store and drove him to

---

6 Johnson was on parole for second degree robbery.
7 Johnson's girlfriend picked him up from his mother's home and took him to the Family Dollar store.   Nothing in the record indicates that any of the Defendants were aware of Johnson's whereabouts until they started tracking him on the GPS.

apartments on Hubbard Street ("the apartments").   While Mr. Johnson was at the apartments, he retrieved a bag of drugs located near a dumpster.[8]

After the Task Force did not locate Johnson at the Family Dollar store, they went to a car wash on Hubbard Street.   While at the car wash, the Defendants again tried to locate Johnson, and concluded that because the GPS indicated that he was moving from location to location, he apparently was in a car.   At this point, the GPS indicated that Mr. Johnson was located at or near the apartments.   Based on this information, Detective Epling drove around the apartment complex in an unmarked police car looking for Mr. Johnson.   Detective Epling did not see Mr. Johnson but did see Mr. Ali in a white car.

After his termination, Mr. Ali resided in Huntington, West Virginia, but still drove to Beckley to work as a substitute teacher.   On June 23, 2015, Mr. Johnson contacted his cousin, Mr. Ali, and asked for a ride.[9]   Mr. Ali met Mr. Johnson at Fletcher Johnson's apartment.   Mr. Ali left Fletcher Johnson's apartment and waited in the car for Mr. Johnson.   When Mr. Johnson approached the vehicle, he was carrying a plastic grocery bag, and asked Mr. Ali to put the bag onto the backseat, but Mr. Ali told Mr. Johnson to put the bag in the trunk.   At this point Mr. Ali and Mr. Johnson headed to a nearby Burger King.

Mr. Ali and Mr. Johnson were stopped in Ali's vehicle at the Burger King drive thru.   The Task Force stopped the vehicle because the GPS indicated that Mr. Johnson's whereabouts were consistent with movement in a vehicle, and at the time, Mr. Ali's vehicle was the only moving vehicle in sight.   Mr. Redden states that he had also contacted Ms. Coppola to see if she knew

---

8 Based on the evidence presented, the record does not resolve who gave Johnson the drugs.
9 Ali contends that in the past he would give Johnson a ride to help him seek employment.   The record does not reveal where, if anywhere, Ali was driving Johnson on the day in question.

what kind of vehicle Mr. Johnson would be in and was told that Mr. Johnson would be in Mr. Ali's white Chrysler.[10]   Mr. Ali drove past the position of the Task Force at the car wash.   Finally, the Task Force followed Mr. Ali's car and visually confirmed that Mr. Johnson was in the vehicle. Based on this information, the Task Force blocked Mr. Ali's car in the drive-thru.   The Task Force ordered both Mr. Johnson and Mr. Ali out of the car at gunpoint and detained them.

After both exited the vehicle and were detained, Mr. Johnson was taken into custody by parole officer Redden. Trooper Pack explained to Mr. Ali that they were there to pick up Mr. Johnson.   Mr. Johnson admitted to Mr. Redden that he had a small amount of marijuana in his pocket.[11]   However, Mr. Pack and others began to notice the smell of marijuana coming from the vehicle, so they had K-9 Toby walk around Mr. Ali's car.   Toby indicated the presence of more drugs in the trunk of Mr. Ali's vehicle.   After the dog alerted to the car, Mr. Ali consented to a search of the vehicle.[12]   (Consent to Search form, Document 244-11).   When the officers searched the vehicle, drugs were found in the trunk of the vehicle in a blue duffle bag containing a white bag of marijuana, cocaine, and some of Mr. Ali's personal effects.   Mr. Ali denied that the drugs were his and Mr. Johnson also initially denied ownership of the drugs, so the police arrested both Mr. Ali and Mr. Johnson.   After the arrest, some Task Force members went to Ms. Coppola's house where Mr. Johnson had been keeping more drugs.   He told them the location of the drugs and Ms. Coppola consented to a search of the house.

---

10  Ms. Coppola contends that she was not contacted by police until after arrest.
11  Redden searched Johnson and found a bag of marijuana in his front pocket.
12  The form is dated incorrectly for June 22, 2015, however, none of the parties dispute the fact that Ali agreed to the search on June 23, 2015.

CRIMINAL PROCEEDINGS FOLLOWING ALI AND JOHNSON'S ARREST

On July 6, 2015, during a preliminary hearing, Mr. Johnson maintained that the drugs located in Mr. Ali's car did not belong to him. The magistrate found probable cause to charge Mr. Johnson with two counts of possession with intent to deliver, and conspiracy. Prior to Mr. Ali's trial, Johnson pled guilty to conspiracy to commit a felony and named Mr. Ali as his co-conspirator, stating that Ali knew what Johnson was doing with the drugs.

Mr. Ali was tried twice on drug charges related to the drugs found in his vehicle. The first trial began on February 13, 2017. Trooper Pack's wife informed the court that she had seen individuals in court speaking to potential defense witnesses. The presiding judge *sua sponte* declared a mistrial and scheduled a new trial for May 2017. On May 22, 2017, the second trial began. On May 26, 2017, the jury returned a verdict finding Mr. Ali not guilty on all the charges.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict

in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be

granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## DISCUSSION

*A. The Section 1983 Claims*

Mr. Ali alleges that his car was unlawfully stopped, that he was falsely arrested, and wrongfully detained. He brought this lawsuit pursuant to 42 U.S.C. § 1983, which provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C.§ 1983. "A section 1983 action . . . is not predicated on the legality or illegality of an act under state law, but on whether that act deprives an individual of 'rights, privileges, or immunities secured by the [federal] Constitution and laws." *Savage v. County of Stafford,* 754 F. Supp. 2d 809, 815 (E.D. Va. 2010) (citation omitted).

The Fourth Amendment and the issue of probable cause are at the heart of this case. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the place or things to be searched.

U.S. Const. amend. IV.    Thus, because arrests are "seizures" of "persons," the Fourth Amendment

establishes that arrests must be justified by a finding of probable cause.    *Id*.    In general, probable

cause to arrest exists when the officers have knowledge or reasonably trustworthy information of

facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief

that the person to be arrested has committed or is committing a crime.    *See, e.g.*, *Dunaway v. New*

*York*, 442 U.S. 200, 208 n.9 (1979); *Wong Sun v. United States*, 371 U.S. 471, 479 (1963);

*Brinegar v. United States*, 338 U.S. 160, 175–76 (1949).    The question of whether or not probable

cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events

and the knowledge of the officers.    *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing

cases).    An arrest in violation of the Fourth Amendment gives rise to a claim for relief under §

1983.    A police officer's warrantless arrest in a public place satisfies the Fourth Amendment if the

arrestee committed a crime in the officer's presence or if the officer had probable cause to believe

that the arrestee committed the crime.    *United States v. Watson*, 423 U.S. 411, 417 (1976).    That

officer may even make the arrest if the felony was not committed in the officer's presence.    *Id.* at

418.

To determine if probable cause exists, the Court must examine the events leading up to the

arrest to decide if the historical facts, viewed from the standpoint of an objectively reasonable

police officer, amounted to probable cause.    *D.C. v. Wesby*, 138 U.S. 577, 586 (2018).    Moreover,

because probable cause deals with both probability as well as the totality of circumstances, it is

difficult to reduce it to a neat set of rules and requires only a *probability or substantial chance of*

*criminal activity*.    *Id*.    Notably the Supreme Court has explained that "[p]robable cause 'is not a

high bar.'"    *Id*.

The Defendants, in their respective individual capacities, raise qualified immunity as a defense to Ali's constitutional claims. This defense is appropriately resolved on summary judgment. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001). ("Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."). Under the doctrine of qualified immunity, "[g]overnmental officials performing discretionary functions are shielded from liability for money damages so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Tomashek v. Raleigh Cty. Emergency Operating Ctr.*, No. 2:17-CV-01904, 2018 WL 522420, at *3 (S.D.W. Va. Jan. 23, 2018) (Goodwin, J.) (quoting *Maciariello v. Sumner*, 973 F.3d 295, 298 (4th Cir. 1992)). Defendants asserting a qualified immunity defense first bear the burden of "demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties." *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997) (internal quotation marks omitted.)

Officials are protected even if they make reasonable mistakes of fact or law, so long as they do not violate a clearly established statutory or constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). Courts are advised to "ask first whether a constitutional violation occurred and second whether the right violated was clearly established."[13] *Id.* "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (internal quotation marks and citations omitted); *Anderson v. Creighton*, 483 U.S. 635,

---

13 "Courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Smith v. Ray*, 781 F.3d 95, 106, fn 3 (4th Cir. 2015) (citing *Pearson*, 555 U.S. at 223, 236).

640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but . . . that in the light of pre-existing law the unlawfulness must be apparent."). The reasonableness analysis is objective. Courts must "examine[ ] only the actions at issue and measure[ ] them against what a reasonable police officer would do under the circumstances," but the inquiry "must be filtered through the lens of the officer's perceptions at the time of the incident." *Rowland v. Perry*, 41 F.3d 167, 172-73 (4th Cir. 1994). "[T]he officer's subjective state of mind is not relevant to the qualified immunity inquiry but his perceptions of the objective facts of the incident in question are." *Id.* at 173.

The undisputed facts which were known to the Defendants are as follows. Ms. Coppola provided a tip to the parole officer, indicating that Mr. Johnson had a large quantity of drugs in her home. Mr. Redden acted on this information by issuing a hold and commit order for Mr. Johnson. He also contacted the Task Force to assist with detaining Mr. Johnson, because he suspected that Mr. Johnson was in violation of his parole. Mr. Redden maintains that he contacted the Task Force because of the alleged illegal drug activity and because of Mr. Johnson's criminal history. He and the Task Force began searching for Mr. Johnson, using GPS tracking. Mr. Ali (driving) was traveling with Mr. Johnson (passenger). The Task Force positively identified Mr. Johnson as a passenger in Mr. Ali's vehicle and stopped it. Mr. Johnson was on parole when the vehicle was stopped and was required to submit to a search without a warrant of his person. Police smelled marijuana emitting from the vehicle. A trained drug sniffing dog was called to the scene and alerted to both the passenger side and the trunk of the vehicle. Mr. Ali gave written consent for the search of his vehicle. (Consent to Search form, Document 244-11). Police discovered a

bag belonging to Mr. Ali. Inside that duffel bag, they found a plastic grocery bag which contained marijuana and cocaine. There can be no dispute that the conduct complained of here fell within the scope of the parole and Task Force officers' duties.

Viewing this evidence in the light most favorable to Mr. Ali, there is not a genuine issue of material fact as to whether the Defendants' conduct was objectively reasonable. Mr. Redden received a tip from Ms. Coppola, Mr. Johnson's mother, and began investigating it. In the process of investigating Mr. Johnson, officers found illegal drugs in Mr. Ali's car which, at the time, both Mr. Ali and Mr. Johnson indicated did not belong to them. If it is supported by probable cause, an officer may make a warrantless arrest of an individual in a public place. *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004). Moreover, Mr. Ali consented to the search that led to the discovery of the drugs and to his arrest. Although Mr. Ali takes issue with the stop of his vehicle, his arrest, and subsequent prosecution, the undisputed facts of this case provide sufficient support for the probable cause determination.

Because the Defendants had probable cause to suspect that Mr. Ali as well as Mr. Johnson were engaged in illegal drug activity, Mr. Ali's arrest was not objectively unreasonable, and the Defendants are entitled to qualified immunity in their individual capacity as Ali cannot establish that a violation of his Fourth Amendment rights occurred. As such, summary judgment in the Defendants' favor is appropriate as to Count IV - Warrantless Arrest Pursuant to False Tip in Violation of 42 U.S.C. § 1983 and Count VII - False/Wrongful Arrest and Improper Investigation and Prosecution in Violation of 42 U.S.C. § 1983.

*B. Conspiracy to Violate Plaintiff's Civil Rights*

The Defendants argue that Mr. Ali has not produced any evidence to support his claim that they conspired to interfere with his civil rights. Mr. Ali makes several arguments to support his conspiracy claim. First, he claims that then Sheriff Tanner called him "boy," which he argues a trier of fact could find was a racially charged statement, and evidence that Mr. Tanner harbors a racial animus towards him.[14] Second, Ali argues that Detective Epling recognized him while he waited for Mr. Johnson at the apartments, and further, that Epling told parole officer Redden and the Task Force of Ali's presence at the apartments prior to his arrest. Mr. Ali asserts that this is evidence that the Task Force conspired to stop and arrest him once he was with his cousin. Next, after the arrest, then Sheriff Tanner was contacted by the Task Force to alert him that Mr. Ali was arrested while they were trying to apprehend Mr. Johnson. Ali argues this is evidence that there was a conspiracy to arrest him as well. Also, Mr. Ali notes that Tanner hired Redden for a position with the Raleigh County Sherriff's office some months after Mr. Ali's arrest, which he asserts was a reward for participating in the conspiracy. Finally, before Mr. Ali's trial, Officer Snuffer admitted that there may have been a meeting with other Task Force officers before Mr. Ali's February 2017 trial, which he contends is evidence that after the Defendants conspired to falsely arrest him, they further conspired together to ensure he was convicted.

Section 1985(3) provides:

> If two or more persons in any State or Territory conspire…for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws[.]…[I]n any case of

---

14 With respect to the term "boy," the Supreme Court has noted that "[a]lthough it is true the disputed word will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).

conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). This cause of action is directed at those who conspire to deprive protected classes of people of their rights. *Buschi v. Kirven*, 775 F.2d 1240, 1257 (4th Cir. 1985). The federal remedy, construed broadly, is for "conspiracies involving invidious animus toward a class of persons" who are not adequately protected by the state. *Id.* at 1258 (internal quotation marks omitted). The elements of proof for a § 1985(3) cause of action are: "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995) (citing *Buschi*, 775 F.2d at 1257). "[A]n express agreement is not necessary, although it must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Id.* at 1378 (citation and internal quotation omitted). This is a "relatively stringent standard" that requires sufficient evidence that the alleged conspirators participated in a joint plan. *Id.* at 1377.

The Amended Complaint alleges that "Defendants illegally willfully, wrongfully, maliciously and intentionally conspired to deprive Ali of his constitutionally protected rights, privileges and immunities," because of discriminatory animus based on Ali's race and/or [Ali's] intent to pursue action against Defendants' Raleigh County, Raleigh County Sheriff's Department

17

and Tanner." (Amended Compl. ¶ 193-95, Document 23). However, Mr. Ali has produced no evidence to support this allegation. Mr. Ali's conspiracy claim is somewhat convoluted. He alleges that his termination was based on racial bias, and he appealed it to the Civil Service Commission. Mr. Ali alleges that because he filed an appeal with the Civil Service Commission, then Sheriff Tanner conspired with the other Defendants to stop his vehicle while his parolee cousin was in the car which allowed them to plant illegal drugs in the trunk and arrest them both. The most compelling evidence that there may be racial animus is the evidence that Mr. Tanner called Ali "boy." However, a 42 U.S.C. § 1985(3) requires "two or more persons" to engage in a conspiracy.

Mr. Ali has presented no direct evidence, or evidence from which the Court could draw a reasonable inference, that there was a meeting of the minds between Mr. Tanner and any one or more of the other Defendants to deprive him of his constitutionally protected rights. Specifically, evaluating the evidence in the light most favorable to Mr. Ali, his claim must fail because he has presented no evidence that any of the other alleged Defendants conspired with Tanner, based on racial animus or based on retaliation as a result of his intended claims against Raleigh County, the Raleigh County Sheriff's Department or Tanner. The Fourth Circuit has expressly stated "the plaintiff must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights. [W]e have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts. *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (Internal citations and quotations omitted). Mr. Ali's section 1985 conspiracy claim rests entirely on conclusory statements lacking evidentiary support.

Moreover, without an underlying § 1985 claim, Mr. Ali's § 1986 claim must also fail, because if there was no conspiracy afoot, the Defendants cannot possibly be negligent in preventing one. Therefore, summary judgment as a matter of law is appropriate as to Count V - Conspiracy to Interfere with Constitutional Rights in Violation of 42 U.S.C. § 1985(3) and Count VI - Neglect to Prevent Conspiracy to Interfere with Plaintiff's Rights.

*C. Abuse of Process*

The Defendants move for summary judgment on Count VIII - Abuse of Process. They argue that Mr. Ali has provided no evidence to support the abuse of process claim. Mr. Ali reiterates the allegations in his Amended Complaint that the Defendants conspired with each other and took actions necessary to facilitate his arrest.

"Generally, abuse of process consists of the willful or malicious misuse or misapplication of lawfully issued process to accomplish some purpose not intended or warranted by that process." *Preiser v. MacQueen*, 352 S.E.2d 22, 28 (W.Va. 1985). "To properly state a claim for abuse of process, a plaintiff must allege: first, an ulterior purpose, and second, a willful act in the use of the process not proper in the regular conduct of the proceeding." *Westfield Ins. Co. v. Mitchell*, No. 2:12-CV-00585, 2013 WL 4742832, at *4 (S.D.W. Va. Sept. 3, 2013) (internal citations omitted). According to the West Virginia Supreme Court, "[t]he authorities are practically unanimous in holding that to maintain the action [for abuse of process] there must be proof of a willful and intentional abuse or misuse of the process for the accomplishment of some wrongful object—an intentional and willful perversion of it to the unlawful injury of another." *Preiser*, 352 S.E.2d at 28. As the Court discussed above, Ali has presented no evidence of a criminal conspiracy. Further, Ali has not presented sufficient evidence to permit a jury to find that one or more of the

Defendants had an ulterior motive in arresting him. On the contrary, the evidence suggests that the Defendants' actions were supported by probable cause. Furthermore, the record reflects that there is no genuine issue of material fact as to whether the criminal process involving Mr. Ali, once initiated, involved some act by the Defendants, which was improper in the regular prosecution of the proceedings. As such, qualified immunity applies, and summary judgment in the Defendants' favor is appropriate as to Count VIII - Abuse of Process.

*D. Malicious Prosecution*

According to the West Virginia Supreme Court,

> [i]n an action for malicious prosecution, plaintiff must show: (1) that the prosecution was set on foot and conducted to its termination, resulting in plaintiff's discharge; (2) that it was caused or procured by defendant; (3) that it was without probable cause; and (4) that it was malicious. If plaintiff fails to prove any of these, he cannot recover.

Syl. Pt. 3, *Hines v. Hills Dep't Stores, Inc.*, 454 S.E.2d 385, 387 (W. Va. 1994). In a separate line of cases, the West Virginia Supreme Court held that the requisite elements for a malicious prosecution were only three, and included "(1) that the prosecution was malicious, (2) that it was without reasonable or probable cause, and (3) that it terminated favorably to plaintiff." Syl. Pt. 1, *Preiser*, 352 S.E.2d at 22. However, in examining these two different delineations of the malicious prosecution elements, the same court held that they were the same, and that "procurement [of the prosecution by the defendant] is an inherent element in both." *Norfolk S. Ry. Co. v. Higginbotham*, 721 S.E.2d 541, 546 (W. Va. 2011). Because, as discussed above, probable cause supported Ali's arrest, his malicious prosecution claim must fail. Moreover, qualified immunity further shields the claims against the Defendants in their official capacity as an arrest supported by probable cause is neither malicious nor corrupt. *Spivey v. Norris*, No. 7:15-

CV-160-BO, 2017 WL 1184103, at *6 (E.D.N.C. Mar. 29, 2017), aff'd, 731 F. App'x 171 (4th Cir. 2018) (*citing Anderson v. Caldwell Cty. Sheriff's Office,* 524 Fed. App'x. 854, 863 (4th Cir. 2013) (where probable cause existed to support arrest warrant individual capacity defendants shielded from liability). Thus, summary judgment is appropriate as to Count IX - Malicious Prosecution.

*E. Negligent Infliction of Emotional Distress*

Count X of Mr. Ali's complaint asserts a claim for negligent infliction of emotional distress. (Amended Compl. ¶ 239-49, Document 23). West Virginia recognizes negligent infliction of emotional distress as a viable cause of action. *See Syl. pt. 1, Heldreth v. Marrs*, 425 S.E.2d 157 (1992) (Noting that "[a] defendant may be held liable for negligently causing a plaintiff to experience serious emotional distress, after the plaintiff witnesses a person closely related to the plaintiff suffer critical injury or death as a result of the defendant's negligent conduct, even though such distress did not result in physical injury, if the serious emotional distress was reasonably foreseeable.) Mr. Ali's claim must fail for two reasons. First, Ali did not plead, nor did he argue, that he witnessed a person close to him suffer a critical injury. On the contrary, he pled that this count was based on his own alleged personal injury. Moreover, the evidence before the Court indicates that the conduct by the police in this case was intentional and purposeful. This claim is not legally viable given the argument and evidence presented. Accordingly, summary judgment in favor of the Defendants as to Count X - Negligent Infliction of Emotional Distress, is appropriate.

*F. Outrage*

The Defendants argue that Mr. Ali has provided insufficient evidence to survive summary judgment on the outrage claim.   The tort of outrage requires that:

> One, the wrongdoer's conduct was intentional or reckless.   This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result.   Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality.   This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved.   Three, there was a causal connection between the wrongdoer's conduct and the emotional distress.   Four, the emotional distress was severe.

*Harless v. First Nat'l Bank of Fairmont,* 169 W.Va. 673, 289 S.E.2d 692, 704 (1982) (internal quotation marks omitted).   A court must consider whether a defendant's actions might reasonably be interpreted as outrageous.   The West Virginia Supreme Court of Appeals explained:

> In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress.   Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination.

*Hatfield v. Health Mgmt. Assocs. of W. Va.,* 672 S.E.2d 395, 404 (2008).   The tort does not require a finding of physical injury.   *Hines v. Hills Dep't Stores, Inc.,* 454 S.E.2d 385, 389 (1994).   However, it is "a difficult fact pattern to prove." *Id.* at 390.   "[C]onduct that is merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent does not constitute outrageous conduct." *Courtney v. Courtney,* S.E.2d 418, 423 (1991).   The Court finds that Defendants' conduct cannot reasonably be regarded as so extreme and outrageous to constitute the

tort of outrage under West Virginia law. The evidence in the case suggests that the police ordered Mr. Ali out of the vehicle and explained that he was stopped because they were trying to detain Johnson. The actual evidence supports the position that Mr. Ali was not the target of the stop until the drugs were discovered in the bag located in trunk of his vehicle. Additionally, nothing in the record suggests that police engaged in conduct that rises to the level of tortious outrage. Therefore, the Defendant's motion must be granted as to Count XI - Outrage.

## CONCLUSION

WHEREFORE, after thorough review and careful consideration, the Court **ORDERS** that *Defendants Gary Epling and Jason Redden's Motion for Summary Judgment* (Document 242), *Defendants Raleigh County and Steven Tanner's Motion for Summary Judgment* (Document 244), *Defendants City of Beckley and David Snuffer's Motion for Summary Judgment* (Document 246), and *Defendant Kenneth Pack's Motion for Summary Judgment* (Document 248) be **GRANTED**. The Court **ORDERS** that the *Amended Complaint* (Document 23) be **DISMISSED**, that all other pending motions be **TERMINATED AS MOOT**, and that all further deadlines, hearing and trial dates contained in the scheduling order be **CANCELLED.**

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER:     May 14, 2019

*Irene C. Berger*
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA